**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

|  |  |  |
|---|---|---|
| IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION | ) ) ) ) ) ) ) ) ) | **Case No. 1:17-MD-2804**<br><br>**Professor William B. Rubenstein**<br><br><br>**REPORT AND RECOMMENDATION ADDRESSING MOTION FOR COMMON BENEFIT FUND** |

Before the Court is Plaintiffs' *Amended* Motion for Entry of Order Establishing Common Benefit Fund. Doc. #: 3112. Numerous parties and non-parties have filed oppositions to the motion, Docs. ##: 3181, 3185, 3186, 3189, 3190, 3191, 3192, 3193, 3194, 3195, 3197, 3198, 3209, and the movants have filed a reply, Doc. #: 3212. Pursuant to my role as expert consultant for the Court, *see* Doc. #: 3218, I recommend that the Court solicit additional briefing from interested parties before issuing a ruling on the motion. This report explains the reasoning behind that recommendation and sets forth specific questions for further briefing.

A common benefit fee is a type of fee device typically employed in MDLs that consolidate numerous individual cases – each with its own individually-retained plaintiffs' attorney (IRPA) – and authorize a smaller group of attorneys to run the plaintiffs' side of the case as the plaintiffs' steering committee (PSC). The common benefit fee requires the IRPAs to share a portion of their attorney's fee with the PSC. (A common benefit fee may be taxed against the recoveries of un-represented settling parties in the same manner.) In doing so, the common benefit fee solves two inter-related problems: (1) it ensures that the IRPAs are not unjustly enriched by reaping their full contingent fee even though other lawyers are doing some portion of their work, and (2) it simultaneously provides a mechanism for funding those other

lawyers' (the PSC's) work.  The intra-lawyer tax is labelled a "common benefit fee," in that it pays for legal work (typically, the PSC's) that "commonly benefited" any settling case.  *See generally* William B. Rubenstein, 5 *Newberg on Class Actions* § 15:112 (5th ed.) (hereinafter *Newberg on Class Actions*).

Ideally, the lawyers in a case of this structure work out the common benefit tax among themselves; if contracting is a viable option, then resort to court-imposed measures is unnecessary.  *See* Restatement (Third) of Restitution and Unjust Enrichment § 29(3)(d) (Am. Law Inst. 2011) ("(3) A beneficiary is liable in restitution only if . . . (d) liability will not impose an obligation that should properly have been the subject of contract between the claimant and the beneficiary.").  Where contracting has not worked – or where it cannot work – PSCs have turned to the courts for common benefit orders.  To demonstrate their entitlement to a common benefit fee, proponents must show that their work "substantially benefited" the cases to be taxed.  *See In re Genetically Modified Rice Litig.*, 835 F.3d 822, 830 (8th Cir. 2016) ("The equitable common-benefit doctrine permits a district court to redistribute costs among plaintiffs when the litigation has conferred a substantial benefit on the members of an ascertainable class, and where the court's jurisdiction over the subject matter of the suit makes possible an award that will operate to spread the costs proportionately among them.") (internal quotation marks and citations omitted); *In re Diet Drugs*, 582 F.3d 524, 546 (3d Cir. 2009) ("[I]n order to obtain common benefit fees, an attorney must confer a substantial benefit to members of an ascertainable class, and the court must ensure that the costs are proportionately spread among that class.").  The tax is generally calculated in the range of 5% for fees and 2.5% for costs.  5 *Newberg on Class Actions* § 15:117.

2

If MDLs invariably resulted in a single aggregate settlement in the MDL forum, assessing common benefit fees would be straightforward and would parallel, in many ways, the assessment of a class action fee at the conclusion of a common fund class action case.  The problem in MDLs of this type is that, because there are so many lawyers and clients, large and small satellite settlements may arise throughout the course of the MDL – and often in advance of (or instead of) an aggregate settlement.  This raises a timing issue: if a common benefit assessment is appropriate, it may need to be levied prior to an aggregate settlement, lest satellite settlement monies be distributed and then lie outside the reach of a later levy.  MDL courts have solved this timing problem by developing a two-stage common benefit fee process.  At the first stage, a common benefit fee is assessed against early settlements and the monies are placed in an escrow account.  The mechanism for effectuating the monetary transfer from the IRPAs (or their settling clients) to the escrow fund is typically an order from the Court requiring that a defendant settling any case "hold back" a certain percentage of the settlement for this purpose.  *Id.* at § 15:115.[1]  At the second stage, usually after the PSC has reached an aggregate settlement, common benefit fees are distributed from the escrow fund via a normal fee application, with any excess funds being returned to the taxed parties.  *Id.*

The present motion is a first stage – assessment – motion, seeking a common benefit assessment of 7% (6% fees, 1% costs).  Doc. #: 3112 at 3.  The Plaintiffs' Executive Committee ("PEC") argues that it has worked tirelessly over a two-year period, at enormous financial and personal cost, and that its many efforts have served to move the litigation forward.  Doc. #: 3212

---

[1] This Court entered such a holdback order at the time of the initial bellwether settlements in this matter, though it ordered that the plaintiffs themselves direct the monies to an escrow fund. *See* Order Regarding Track One Settlement Funds, Doc. #: 2980 at 1-2 (ordering, so as "ensure that any eventual common benefit assessment remains payable from settlement funds," that "the Track One Plaintiffs shall place into escrow 7.5% of any settlement funds they receive or received from any defendant").

3

at 3 (stating that the common benefit work includes "taking 550 depositions; serving 330 third party subpoenas; developing scores of experts; briefing and prevailing on multiple motions to dismiss and motions for summary judgment; preparing for multiple bellwether trials; and analyzing over 162 million pages of documents," and stating that the common benefit lawyers have expended "over 1.2 million hours of their time," and have paid "nearly $100 million" to "fund the common benefit work.").[2]  Essentially, the PEC contends that all of the time and money its members have invested have helped clarify factual and legal issues and helped establish the groundwork from which settlements might emerge.  Even opponents of the proposed assessment acknowledge some of these facts.  *See, e.g.*, Doc. #: 3192 at 2 ("[T]he Opposing Governmental Plaintiffs do not gainsay the value of the work that the Plaintiffs' Executive Committee (the 'PEC') and other plaintiffs' counsel have completed in the present multidistrict litigation (the 'MDL'). These attorneys are entitled to just compensation for their important work.").  The PEC has undertaken this work on a contingent basis, of course, meaning it may ultimately receive no compensation for those efforts.  Nonetheless, given the common benefit work to date (coupled with many other factors), it is not implausible that: (1) even absent a global settlement, one or more defendants could settle with single plaintiffs or groups of plaintiffs, and (2) the PEC's common benefit work will have significantly contributed to those outcomes, thereby conferring a "substantial benefit" and entitling the PEC to a common benefit fee.  That possibility, the PEC argues, demonstrates that a common benefit assessment order is timely.

---

[2] Some opponents point out that the moving papers, at present, proffer no factual support for any of these statements.  *See, e.g.*, Doc. #: 3189 at 5.  To the extent that the movants aim to demonstrate factually that their efforts have substantially benefited the many satellite cases they seek to tax, and the time and costs expended to achieve that end, the record would be stronger if their legal arguments were substantiated with proper supporting affidavits or documents.

Yet, my recommendation is that the Court proceed cautiously with respect to this request. This MDL is truly unique and, as with many aspects of this litigation, the present common benefit motion tests uncharted waters. Four factors are of note.

*First*, the fee application comes in advance of any aggregate settlement. This fact alone is fairly normal, as described above. But in that normal situation, the Court levying the fee envisions that, if a future aggregate settlement is to take place, it is highly likely that the PSC will have created it and the MDL court will be the forum in which it is effectuated. What is unique here is that it is entirely unclear at this point if an aggregate settlement is feasible, what structure it might take, which defendants will settle, what role this forum will play in it, and whether the settlement structure will require a "common benefit fee" approach to ensuring that these PEC's lawyers are compensated for their efforts.

*Second*, to the extent that the present motion aims to tax satellite settlements, those too differ from the typical MDL. In the typical case, there are many plaintiffs and one or a few defendants. Here, there are numerous different types of plaintiffs (cities, counties, tribes, hospitals, third-party-payors, and so on) and dozens and dozens of different defendants involved in distinct aspects of the pharmaceutical chain (manufacture, distribution, retail sale, etc.). The permutations of possible settlements – and settlement types – are staggering. A single common benefit assessment levied on multiple different types of settlements involving many different types of plaintiffs and multiple defendants runs the risk of being too crude an approach.

*Third*, the fact that most of the satellite settlements the PEC seeks to tax involve cases brought by state, county, city, or tribal governmental entities presents another unique factor that may pose difficult legal questions.

5

*Fourth*, the Court is being asked to rule on this motion while complex, multi-party aggregate settlement negotiations are underway and, as many opponents to the motion warn, any ruling from this Court concerning either a fee entitlement or calculation level could significantly impact those negotiations.  Indeed, the warnings are dire:  the National Association of Attorneys General suggests a common benefit fee might "disrupt" settlement progress "irreparably," Doc. #: 3181 at 1; the Defendants argue that a common benefit order would "seriously jeopardize" global settlement possibilities, Doc. #: 3186 at 1; and certain Governmental Plaintiffs contend that the order would "sabotage" global settlement efforts, Doc. #: 3192 at 3.

Cumulatively, these assertions show that the Court is being asked to act on novel legal issues in a state of factual uncertainty.

Given these difficult competing concerns, I recommend that the Court seek additional information to assist in its consideration of these complex issues.  Below, I identify five specific issues and set forth specific questions for further briefing on each issue.  I recommend that the Court issue an Order (a) requiring that the movants submit a brief addressing all five of the issues set forth below and (b) inviting any other interested party to submit a brief addressing any or all of these issues.

1.      The public record reflects that a global settlement may encompass a separate pot of money dedicated solely to attorney's fees. *See, e.g.*, Doc. #: 3192 at 3 ("[I]t should be obvious from what has been publicly disclosed that any multi-billion-dollar resolution spearheaded by the Attorneys General would necessarily entail requests by the Distributor Defendants and Johnson & Johnson for broad releases and the resolution of claims for attorneys' fees, including by the MDL counsel. For that reason, the Proposed Order is unnecessary to protect the interests of the

6

MDL PEC or to reach a fair allocation of the available total fees among counsel prosecuting these cases in different jurisdictions.").

The Court should invite briefing on the following question:

**Q1:    (a) How likely is it that a global settlement will have specific funds to compensate all attorneys in these matters such that the Court will not need to render a common benefit order? (b) Can the Court simply wait to see if such settlement structures emerge before taking the more intrusive step of requiring common benefit holdbacks and, if not, why not?**

2.       Following the initial bellwether settlements, with the cooperation of the underlying attorneys, this Court entered an order that the settling parties escrow 7.5% of their recoveries in anticipation of a future common benefit order.  Doc. #: 2980.  As the parties are aware, other exemplary cases are scheduled for trial in federal courts throughout the country.  As noted above, court-ordered common benefit assessments are necessary only when the lawyers cannot voluntarily reach agreement among themselves.

The Court should invite briefing of the following question:

**Q2:  (a) How likely is it that the parties and lawyers in the upcoming exemplary cases can reach an agreement on a common benefit contribution?   (b) If an agreement seems unlikely, identify and discuss the obstacles to agreement and how they might be resolved.**

3.       Some opponents of this request note that the PEC could attempt to enter agreements with state court plaintiffs as well.  Doc. #: 3191 at 10 ("Before the MDL Plaintiffs are permitted to exact a 7% tax on any state court recovery or settlement, the MDL Plaintiffs should have to obtain the written consent of state court plaintiffs to contribute to the common benefit fund. . . . If the MDL Plaintiffs want to condition the sharing of work product or anything else on a state court plaintiff's agreement to contribute to the common benefit fund, the MDL Plaintiffs should have to lay out the terms of the deal in writing and obtain written consent.").  Moreover, other parties propose that, in lieu of a common benefit assessment on state court

settlements, which raises significant federalism concerns, the PEC could simply seek a lien against those cases in state court. Doc. #: 3192 at 11 ("To the extent that local counsel proceed to litigate individually in state court, the MDL is free to assert an 'attorneys lien' in state court to compensate them for the benefits conferred and costs saved to local counsel. The proper amount of such compensation will likely vary by circumstance. Relevant factors may include (i) the usefulness of the MDL attorney's work to the prosecution of a state court case, (ii) state court counsel's own costs and time spent prosecuting the case, and (iii) the total amount of attorney fees made available in that jurisdiction. State courts recognize that counsel should be paid for their contribution to successful litigation, and can be trusted to make it happen.").

The Court should invite briefing of the following question:

**Q3: (a) How likely is it that the PEC and state court litigants can reach an agreement on a common benefit contribution? (b) If an agreement seems unlikely, identify and discuss the obstacles to agreement, how they might be resolved, and whether a lien approach is an appropriate and viable alternative.**

4. Percentage-based fee awards are a function of two data points – the percentage assessed and the amount it is a percentage of. My empirical data from 35 fee assessments and 26 cost assessments show that the average assessment is 4.99% for fees and 2.49% for costs (about 7.5% altogether), and the median assessment is 4% for fees and 2% for costs (about 6% altogether). 5 *Newberg on Class Actions* § 15:117. The PEC's request of 6% for fees and 1% for costs (7% altogether) is therefore, in total, just below the mean and just above the median. Yet empirical data strongly demonstrate that percentage-based attorney's fees decrease as settlement values increase. *Id.* at § 15:81. Potential settlements in this matter could be enormous. *See, e.g.*, Doc. #: 3186 at 2 ("[A] 7% share of the settlement framework announced in October 2019 would exceed $3.3 billion. And that would be just the beginning: the PEC will

attempt to recover additional fees under contingency agreements, to say nothing of the amounts that other plaintiffs' counsel will demand.").

The Court should invite briefing of the following question:

> **Q4: (a) How should a common benefit assessment account for the potential size of the taxed settlements, if at all? (b) Does the PEC's proposed 7% common benefit assessment properly account for the potential size of settlements in this matter? If so, explain how. If not, explain how it should be adjusted to do so.**

5. Some opponents of the common benefit assessment point out that the IRPAs' underlying contingent fee agreements are with public entities, often at below-market rates. *See, e.g.*, Doc. #: 3192 at 9 & n.4 ("[A]ssessments under the Proposed Order are potentially excessive and, if charged to local counsel, will dramatically and unfairly reduce their contracted for contingency rates. [FN4] Many of the firms signing this letter entered contingency contracts with their public entity clients at rates far less than they would charge private clients."); *id.* at 10 ("Unlike the ordinary contingency litigation involving private plaintiffs, if there were to be a global settlement here, local counsel will receive nowhere near the typical attorney fee contingencies (30-33 1/3%), as against which the 7% assessment would be applied.").

The Court should invite briefing of the following question:

> **Q5: (a) How should a common benefit assessment account for the size of the underlying IRPA's contingent fee, if at all? (b) Does the PEC's proposed 7% common benefit assessment properly account for the level of these IRPAs' contingent fee contracts? If so, explain how. If not, identify what evidence there is of the contingent fee levels in the underlying contracts and discuss how the common benefit fee should be adjusted to take account of that evidence.**

\* \* \*

It is my recommendation that the Court (a) direct that the movants submit a brief no more than 25 pages in total length addressing all of these issues and (b) invite any other interested entity (whether or not a formal party within this MDL) to submit a similarly-limited brief

addressing any or all of these issues.  After the Court has received and reviewed these responses, it will be in a better position to issue a ruling on the outstanding motion, as necessary.

As this report and recommendation concludes my assignment at this time, I ask that the Court provide notice to the parties that my work in this matter has ended as of the Order date.  If the Court would welcome my assistance again, as the MDL progresses, I would of course be honored to be re-retained at that time.

Respectfully submitted,

*/s/ William B. Rubenstein*_____
**WILLIAM B. RUBENSTEIN**

**Dated:  June 3, 2020**